SHALINI DOGRA, SBN 309024
*shalini@dogralawgroup.com*
DOGRA LAW GROUP PC
2219 Main Street, Unit 239
Santa Monica, CA 90405
Telephone: (747) 234-6673
Facsimile: (310) 868-0170
*Attorneys for Named Plaintiffs and Proposed Class*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| STEVEN PRESCOTT, individually and behalf of all others similarly situated; JONATHAN HOROWITZ, individually and on behalf of all others similarly situated; DIANE CARTER, individually herself and on behalf of all others similarly situated; <br><br> Plaintiffs, <br><br> v. <br><br> SARAYA USA, INC., a Utah Corporation; and DOES 1 through 50, Inclusive, <br><br> Defendants. | Case No: 23-CV-0017-AJB-MDD <br><br> **PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> 1. INTENTIONAL MISPRESENTATION <br><br> 2. NEGLIGENT MISREPRESENTATION <br><br> 3. CONSUMERS LEGAL REMEDIES ACT, CAL. CIV. CODE §§ 1750, *et seq.* <br><br> 4. VIOLATION OF THE FALSE ADVERTISING LAW ("FAL"), CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17500, *et seq.* <br><br> 5. VIOLATION OF THE UNFAIR COMPETITION LAW ("UCL"), CALIFRONIA BUSINESS AND PROFESSIONS CODE §17200 *et seq.* <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Steven Prescott, Plaintiff Jonathan Horowitz, and Plaintiff Diane Carter by and through their attorneys, bring this action on behalf of themselves and all other similarly situated against Saraya USA, Inc. ("Defendant Saraya"), and Does

1

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT

1 through 50. Plaintiffs hereby allege, on information and belief, except as those allegations which pertain to the named Plaintiffs, which allegations are based on personal knowledge, as follows:

## NATURE OF THE ACTION

1.    To capitalize on the premium price consumers are willing to pay for forms of sweeteners that purportedly lack the harmful side effects of traditional sugar, Defendants intentionally make false and misleading representations about their "Lakanto Monkfruit Sweetener" product line. Defendants further deceive consumers about their sugar substitutes to take advantage of diabetics, as well as individuals who are seeking out healthier forms of desserts and sweet foods.

2.    Aware that consumers place a higher value on alternatives to sugar that can sweeten food without the negative impact that is typically associated with sugar, including weight gain and exacerbation of diabetes, Defendants deliberately make false and misleading statements about the nutritional value and health benefits of their "Lakanto Monkfruit Sweetener" product line, which contains two types/flavors of sugar substitutes: "golden" and "classic" ("the Products").

3.    Defendants consistently label and advertise the Products as "ZERO NET CARBS," "ZERO GLYCEMIC," "ZERO CALORIE," "1:1 SUGAR REPLACEMENT," "KETO APPROVED" and "KETO." In reality, none of these claims about the Products are true because Defendants have based them on manipulated and incorrect serving sizes. Defendants use unreasonably small serving sizes that fail to account for the manner in which consumers actually use the Products.

4.    Defendants know and have multiple reasons to know that they have predicated their marketing scheme for the Products on unreasonably small serving sizes. First, the serving size that Defendants use for the Products is lower than the "reference amount that is customarily consumed"(RACC) required by federal and state law. Second, Defendants purposely take steps to motivate consumers to use

amounts of the Products that exceed the serving size that Defendants have listed on the Products' nutritional panel.

5.    If Defendants calculated the Products' nutritional value on the actual serving size that was mandated by law, then none of the claims on the Products' front label and packaging would be true. By using a serving size that is lower than the required RACC, Defendants purposely mislead consumers into thinking that the Products lack the harmful side effects of sugar, and thereby increase profits at the expense of unsuspecting individuals. Notably, even if the RACC for the Products was equal to the serving size of four grams that Defendants use, Defendants' advertising scheme and front label claims for the Products would still be untrue.

6.    Additionally, Defendants further misbrand the Products and deceive consumers by consistently perpetuating misleading and false health and structure/function claims about the Products. (see below):




PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT

7. At all relevant times, Defendants packaged, advertised, marketed, distributed and sold the Products to consumers at retail store locations throughout California and the United States based on the misrepresentation that the Products were "zero net carbs," "zero glycemic," "zero calorie," "1:1 sugar replacement," "keto approved," and "keto." In reality, the Products do not confer any of these purported nutritional and health benefits to consumers. The Products actually are not zero net carbs, zero glycemic, zero calorie, a 1:1 sugar replacement, keto, or keto approved.

8. Reasonable consumers rely on product labelling in making their purchasing decisions. When a consumer sees a substitute sweetener labelled as "keto approved," "zero glycemic," "zero calories," "zero net carbs," especially in combination with statements that emphasize the sugar ratio, and reiterated claims regarding keto, zero glycemic and zero calorie, he reasonably expects the sugar replacement to be harmless and lack the health dangers typically associated with sugar. In reliance on Defendants' misleading marketing and deceptive advertising practices for the Products, Plaintiffs and similarly situated class members reasonably thought they were purchasing a substitute sweetener alternative to sugar that provided benefits and value for the human body. In fact, neither Plaintiffs nor any of the member of the putative class received any of the health benefits, nutritional value or food composition they reasonably thought they were buying.

9. Plaintiffs and other consumers purchased the Products because they reasonable believed, based on Defendants' packaging and advertising that the Products provided certain health benefits and helped avoid particular physiological harms. Had Plaintiffs and other consumers known that the Products actually lacked the nutritional value and health benefits that were advertised on the front labels and packages, they would not have purchased the Products or would have paid significantly less for them. As a result, Plaintiffs and other similarly situated class members have been deceived and suffered economic injury.

10. Defendants' labelling, marketing and advertising uniformly involves multiple false and misleading statements, as well as material omissions of fact, concerning the Products that have injured Plaintiffs and the class by tricking them into buying a sugar substitute product and alternative sweetener that is entirely different from what they sought at the time of purchase.

11. Based on the fact that Defendants' advertising misled Plaintiffs and all others like them, Plaintiffs bring this class against Defendants to seek reimbursement of the premium they and the Class Members paid due to Defendants' false and deceptive representations about the serving size, health impact and nutrient content levels of the Products.

12. Plaintiffs seek relief in this action individually and on behalf of all purchasers of the Products statewide in California for intentional and negligent misrepresentation. Additionally, Plaintiffs seek relief in this action individually and on behalf of all purchasers of the Products in California for violation of the California Bus. & Prof. Code §§17500, *et seq.*, California's False Advertising Law ("FAL"), and Bus. & Prof. Code §§17200, *et seq.*, California's Unfair Competition Law ("UCL").

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to the 28 U.S.C. § 1332(d)(2)(A), the Class Action Fairness Act, because the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interests and costs, and, at least one class member is a citizen of a state different from Defendants. Additionally, more than two-thirds of the members of the class reside in states other than those in which Defendants are citizens and in which this case is filed, and therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

14. The Court has personal jurisdiction over Defendants pursuant to Cal. Code Civ. P. § 410.10, as a result of Defendants' substantial, continuous and systematic contacts with the State, and because Defendants have purposely availed

themselves to the benefits and privileges of conducting business activities within the State.

15. Pursuant to 28 U.S.C. §1391, this Court is the proper venue for this action because a substantial part of the events, omissions and acts giving rise to the claims herein occurred in this District. Moreover, Defendants distributed, advertised and sold the Products, which is the subject of the present Complaint, in this District.

## PARTIES

16. Plaintiff Prescott is a resident of California, and lives in the city of Santa Cruz, within the Northern District of California. Plaintiff Horowitz is a resident of California and resides in the city of Los Angeles. Plaintiff Carter is a resident of California, and resides in San Diego County, in the Southern District of California.

17. Defendant Saraya is a corporation headquartered in the State of Utah, with its principal place of business at 553 East Timpanogos Circ. Bldg, G, Ste. 23, Orem, Utah 84097. Defendant Saraya manufactures, mass markets, and distributes the Products throughout California and the United States.

18. Plaintiffs are informed and believe, and based thereon allege that at all times relevant herein each of these individuals and/or entities was the agent, servant, employee, subsidiary, affiliate, partner, assignee, successor-in-interest, alter ego, or other representative of each of the remaining Defendants and was acting in such capacity in doing the things herein complained of and alleged.

19. Plaintiffs reserve their right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendants who has knowingly and willfully aided, abetted, or conspired in the false and deceptive conduct alleged herein.

///

///

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

20.  Consumers often purchase sugar substitutes to avoid the harmful side effects of traditional granulated white table sugar. The trend towards sugar replacements and alternative forms of sweeteners has grown as more studies continue to emerge about the dangers of sugar.  Additionally, especially as diabetes rates increase throughout the nation, the demand for sugar replacements is swelling, so that diabetics can eat  sweet without worsening their condition. Defendants knew or had reason to know that consumers would find the challenged attributes important in their decision to purchase the Products, as indicated by the fact that Defendants repeatedly emphasizes the advertised claims prominently on the front labels of the Products' packaging in capital letters and an eye-catching font that quickly garners a consumer's attention. Defendants consistently advertise the Products as "ZERO NET CARBS," "ZERO GLYCEMIC," "ZERO CALORIE," "1:1 SUGAR REPLACEMENT," "KETO APPROVED" and "KETO." However, Defendants' labelling and marketing scheme for the Products is blatantly false.

21.  Defendants understand that obesity, non-alcoholic fatty liver disease, and diabetes are rising health epidemics and that consumers, concerned about their health and appearance, are willing to pay more for products with reduced calories and carbohydrate levels. Likewise, Defendants are aware that ketogenic, also known as "keto," diets are in higher demand by consumers. In 2020, demand for keto and low-carbohydrate food products increased by approximately twenty-one percent. Fox, MeiMei, "*Three Food Companies Targeting The Growth Keto Diet Market,*" FORBES Magazine (Sep. 23, 2021). Some market studies have found that the global demand for ketogenic food products will reach $12.35 billion in 2024, with an annual growth rate of 5.3% between 2021 and 2024. Roberts, Tobias, "*Keto Diet Market Growth Forecasts for 2021-2024,*" BUSINESS STATISTICS (Feb. 22, 2023). Hence, the claims of "zero net carbs," and "zero calorie" are important to individuals. Sales for monk fruit-based sugar items, such as the Products, rose by seventy percent between 2021

and 2022. Krawiec, Sebastian, "*Alternative sweetener options grow as consumers demand less sugar,*" Nutritional Outlook, Vol. 26, issue 5 (Aug. 15, 2023). Accordingly, Defendants have embarked on a long-term advertising campaign to mislead the public into believing that the Products are healthier alternatives to sugar, with purportedly zero net carbs, a keto-approved composition, zero calories and zero glycemic index value.

22. When people see the statement "zero calorie" predominantly emphasized on a food item's front label, as Defendants have done with the Products here, they will reasonably conclude that the food item can be eaten without ingesting any calories. Similarly, when individuals see the claim "zero net carbs" that Defendants advertise on the Products' front label, they will think that the Products have no net carbohydrates. As explained above, consumers value foods that have zero net carbs and zero calories.

23. Additionally, when reasonable consumers see the Products' "keto approved" and "keto" advertising claims, they will think the Products comply with a ketogenic diet. Individuals typically associate a ketogenic diet as one that is low in carbohydrates, high in protein and high in fat. Here, as demonstrated by various test findings, as well as the Products' own nutritional panel, the Products do not possess any of these ketogenic traits. The Products are not high in protein or fat. On the contrary, the Products proffer no protein or fat nutritional components. Furthermore, the Products are not low in carbohydrate concentration; in actuality, the Products contain about one net carbohydrate per gram, and about 116 net carbohydrates per each bag of the Products.

24. Based Defendants misrepresentations, reasonable consumers are misled into thinking the Products have zero net carbs and zero calories, and conform with a ketogenic diet. Likewise, due to Defendants' false advertising and deceptive "keto approved," "keto," "zero net carb," and "zero calorie" claims, reasonable consumers are tricked into buying and/or paying more for units of the Products.

25.    The Ninth Circuit has held, "[R]easonable consumers should [not]be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box." *Williams v. Gerber Prods. Co*., 552 F.3d 934, 939-40 (9th Cir. 2008). Similarly, the *Williams* court made clear that consumers should not be expected to look beyond a misleading front label to find the truth, and the back label should provide more detail, not undermine the front label. *Id*. Likewise, California courts have made clear that '[y]ou cannot take away in the back find print what you gave on the front in large conspicuous print." *Brady v. Bayer Corp*., 26 Cal. App. 5th 1156, 1172 (2018); see also *Williams*, 552 F.3d at 939 ("We do not think that the FDA requires an ingredient list so that manufacturers can mislead consumers and then rely on the ingredient list to correct those misrepresentations and provide a shield for liability for the deception."). Therefore, Defendants cannot avoid liability simply because the Products target consumers that might more health conscious, especially when Defendants are the entities controlling the Products' packaging, labelling and nutritional panel, and are purposely designing the Products' marketing scheme to attract health-minded consumers.

26.    Furthermore, *Brady v. Bayer* has addressed the issue of what constitutes a reasonable consumer when the challenged product reflects a more heath-minded item, such as the Products , and offers relevant guidance here. *Brady*, 26 Cal. App. 5th at 1156. Critically, the Brady court rejected the notion that "reasonable consumers of vitamins are back-label scrutinizers." *Id*. at 1174. Moreover, various scientific findings notably support the *Brady* court's analysis and further demonstrate that a reasonable consumer is not an individual who would scrutinize or scientifically analyze the Products' serving sizes or nutritional panel here before making his/her purchasing decision. Research has shown that information overload can confuse consumers or promote reliance on heuristic decision-making, in which the consumer simplifies a decision by examining only certain aspects of it. Lauren E. Willis,

*Decision-making and the Limits of Disclosure: The Problem of Predatory Lending: Price*, 65 Md. L. Rev. 707, 766- 71(2006). Decision simplification sometimes means skipping past disclaimers: consumers "ignore [disclosure] data to make their task more management[,]" in order to avoid opportunity costs, or because disclosures look unimportant or they believe they already know what the disclosures will say. Omri Ben-Shara & Carl E. Schneider, *More than You Wanted to Know: The Failure of Mandated Disclosures* 64-78 (2014). Similarly, when consumers face time constraints, they may forego exhaustive product investigations to save time. Willis, *supra* at 742, 767-69. These shortcuts are more likely for low-dollar purchases: where consumers perceive the stakes to be low, decision-making "involves a simpler process of choice where heuristics are more easily applied." Tilde Heding et al., *Brand Management: Research, Theory and Practice* 93 (2d ed. 2016). It is reasonable—and decidedly human—for consumers to simplify their choices in these ways when pressed for time and forced to make rapid decisions about each of many routine purchases in the modern marketplace. Marketers know that real-world consumers take shortcuts, and design their advertising accordingly. One marketing text points out that consumers' tendency to economize cognitive processing means that advertisers "must counter consumers' tendencies to screen out marketing-related stimuli or remain insensitive to them[.]" Allan J. Kimmel, *Psychological Foundations of Marketing* 87 (2d ed. 2018). In light of the 50,000 products available in the typical supermarket, "*the average package has about one-tenth of a second to make an impression on the shopper.*" *Id*. at 90–91 (emphasis added). That timeframe underscores why it is improper to treat the reasonable consumer like a lawyer or judge. As another marketing text frames the issue, "although rational decision models might suggest what people *ought to do* (normative), they are a poor guide for what people *actually do* (descriptive)." Robert East et al., *Consumer Behaviour: Applications in Marketing* 6 (2d ed. 2013) (emphasis in original).  Thus, reasonable consumers, even when they are more focused on health and nutrition, are not "back-label scrutinizers."

27.   21 U.S.C. § 343 states that a food product is misbranded if "its labelling is false or misleading in any manner, with "labelling" defined as "all labels and other written, printed, or graphic matter  (1) upon any article or any of its containers or wrappers or (2) accompanying such article[1]."  Similarly, under California's Sherman Food, Drug and Cosmetic Law ("Sherman Law"), Article 6, §110660, "Any food is misbranded if its labelling is false or misleading in any particular." Additionally, pursuant to the  Nutrition Labelling and Education Act ("NLEA"),  the FDA deems a food product misbranded if it lacks appropriate nutritional labelling. *See* 21 U.S.C. § 403(q).

28.   As part of the FDA's labelling requirements, a food's nutritional  facts and content disclosures must be based on a serving size that reflects an amount that is "customarily consumed."  *See* 21 U.S.C. § 343(q)(1)(A)(i). The FDA has established distinct "reference amount customarily consumed (RACC)"  for certain foods, whereby a food producer must use a minimum serving size equal to the FDA's determined  RACC to calculate its corresponding food item's nutritional values. *See* 21 C.F.R. §§101.9(b)(2) and 101.9(b)(6).  A food manufacturer's failure to adhere to the  FDA's regulated RACC constitutes  unlawful misbranding. *See* 21 U.S.C. § 403(q). Furthermore,   Chapter 4 of California's Sherman Law, §§ 110290 incorporates the NLEA and the FDA's prohibition on false or misleading nutritional content and RACC statements.

29.   Pursuant to 21 C.F.R. §101.12(h), if a food manufacturer is unable to select any of the reference categories from the FDA's "Serving Size Table," as set forth in 21 C.F.R. § 101.12(a)(7), the manufacturer must contact the FDA with evidence to support its serving size to have its serving size approved. *see also* 58 F.R. 2273. Defendants did not take any steps to exercise any of the potential options permitted under 21 C.F.R. §101.12(h) or contact the FDA to seek approval of a "four grams serving size" for the Products. The FDA has determined  an explicit RACC

---

[1] *See* 21 U.S.C. § 321 (m)

level the Products. Under 21 C.F.R. §101.12, the RACC for sugar replacements such as the Products is eight grams. Hence, Defendants must base the Products' nutritional content values on a minimum serving size of eight grams. Yet, as made clear by the Products' back panel, Defendants have relied on a serving size of four grams, one-half of the minimum amount required by the FDA.

30. If Defendants followed the FDA's parameters for the RACC of sugar substitutes and used the agency's mandatory minimum serving size to ascertain the Products' nutritional values, then the Products would not actually be "keto," "zero calorie," "zero glycemic," "zero net carbs," "a 1:1 sugar replacement," or "keto approved." For example, the FDA limits "zero calorie" claims to food items that contain less than five calories per serving. *See* 21 C.F.R. § 101.9(c)(1). Here, eight grams of the Products would have more than five calories and not meet the FDA's qualifications for the "zero calorie" labels. Hence, by manipulating the Products' serving size, Defendants have deceived and continue to mislead consumers about their health benefits and risks.

31. In reality, data results have demonstrated that four grams of the Products contain sixteen calories and four net carbohydrates, while an entire bag of the Products yields 464 calories, and 116 net carbohydrates. Notably, these findings refute the information Defendants present on the Products' nutritional panel, where Defendants misrepresent four grams of the Products as being zero calories. Furthermore, it does not matter that the FDA allows manufacturers to round 5 or less calories down to zero. Here, a four-gram serving of the Products has sixteen calories, while the RACC of eight grams has thirty-two calories. Hence, a serving size of four grams or eight grams has more than five calories. Thus, regardless of whether Defendants used a serving size of four or eight grams, FDA would not permit Defendants to market the Products as "zero calorie," or "calorie free."

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT

32.     Additionally, Defendants know that consumers will foreseeably devour more than four grams of the Products and end up digesting a volume that lacks all the advertised claims. Aside from the fact that the FDA has set the RACC for food items like the Products at twice as much as Defendants' serving size for the Products, Defendants themselves encourage consumers to use more than four grams, as well as eight grams of the Products. Many of the recipes Defendants promote on their website for the Products require substantially more than four grams, as well as eight grams of the sugar substitute. Therefore, Defendants have sufficient notice that individuals will consume multiple servings of the Products, and foreseeably eat amounts of the sugar substitutes that are not "keto approved," "zero calories, "zero glycemic," "zero net carbs," or "1:1 sugar replacement." Notably, the FDA has expressed a preference to base serving sizes on actual consumption habits and the NLEA similarly requires that serving sizes reflect the amounts people actually eat.  As demonstrated by the independent test results, detailed more comprehensively in the paragraphs ahead, if consumers used the amount of the Products that Defendants encourage by way of their advertising and online marketing, the consumers would end up digesting a quantity of sugar substitute that is not "zero calories," "zero glycemic," "zero net carbs," or "1:1 sugar replacement." Defendants know this, and still deliberately continue to perpetuate a deceptive advertising and marketing scheme for the Products.

33.     Defendants' representations on the Products' packaging and on Defendants' website for the Products are designed to trick consumers into believing they can use the Products as a sugar substitute and not ingest any calories or carbohydrates.  But, as clarified in preceding paragraphs, this is not the case.

34.     Separate studies have shown that four grams of the Products contain 4.8 grams of net carbohydrates, i.e., nearly one gram more than what Defendants represent on the Products' packaging. Furthermore, independent tests have also shown that four grams of the Products contain five calories. These findings demonstrate that the four grams of the Products are not "zero calorie" as Defendants

advertise throughout the Products' labelling and nutritional panel. Likewise, these data results, as well as the findings discussed in t preceding paragraphs, indicate that even if the RACC or lawful serving size for the Products was four grams, the Products'' front label claims of "zero calorie" and "zero net carbs" would still be false. Similarly, if Defendants used the legitimate RACC of eight grams that the FDA has established for the Products, then the "zero calorie" and "zero net carbs" claims that Defendants advertise on the Products' front label would still be false. Hence, even after Defendants changed the Products' nutritional panel to reflect a serving size of eight grams, the Products' "zero calorie," and "zero net carb" labelling claims remain false, deceptive and misleading.

35. If Defendants felt that the Products did not appropriately fit in any categories of the FDA's Serving Size Table, Defendants are still not permitted to choose whatever serving size they wish. Instead, the correct choice would have been for Defendants to have filed a petition to request a new serving size be created. Defendants did not so. Notably, even if they had, it is unlikely such a petition would be granted. Such a petition requires data that demonstrates that the new subcategory would be consumed in amounts different enough from the reference amounts for other products in the category, as required by 21 C.F.R.§101.12(f)(13). Defendants do not have any such data. Yet, Defendants know that the FDA permits food markets to round down to zero when a product contains less than five calories. 21 C.F.R. §§101.60(b)(1)(i), 101.62(b)(1)(i). And so, Defendants tried to use a serving size for the Products that would fall below this five-calorie threshold. Notably, as detailed in paragraphs above, the serving size Defendants erroneously picked actually contains too many calories to qualify for this five-calories threshold. Furthermore, this information and data does not support or justify granting Defendants an amended serving size under FDA regulations.

36. The FDA requires food manufacturers to list certain material facts on the packaging of their products. Under 21 C.F.R. §2.1(a), food labels are deemed

misleading if the labels fail to reveal facts that are either (1)"material in light of other representations made or suggested; or (2)"material with respect to consequences which may result from use of the [labeled food] under...conditions of use as are customary or usual." Here, Defendants were required to disclose information about the presence of calories, carbohydrates and non-zero glycemic levels, due to the customary or usual conditions under which the Products are used (and Defendants recommend and encourage the Products to be used) and the fact that Defendants know that the calorie and carbohydrate content is material to consumers, as Defendants have themselves decided to place that information on the front of the Products' packaging.

37. As a sugar and sweetener substitute, consumers use significantly more than four grams and eight grams of the Products, so customary consumption is never "zero net carbs," "zero glycemic," "zero calories," or "keto approved." Defendants know consumers customarily use more than four grams, and more than eight grams, of the Products per serving. Indeed, Defendants encourage it. As consumers are not food scientist, and cannot test products to determine their calorie count or carbohydrate levels, consumers cannot determine if the product they are purchasing is actually zero calories or zero net carb.

38. Furthermore, Defendants trick consumers into digesting much more than a four-gram serving of the Products by falsely advertising the Products as a "1:1 sugar replacement." When consumers see this statement, they reasonably conclude that they can use the Products in the same amount as they would use table sugar. For example, a person who uses two spoons of white or brown sugar in his coffee will reasonably think he should use two spoons of the Products when using the sweetener substitutes. In reality, the Products are approximately 250 times sweeter than table sugar, whereby the Products are not a one-to-one sugar replacement at all. By falsely advertising the Products as a "1:1 sugar replacement," and hiding the truth about the Products being 250 times sweeter than sugar, Defendants deceive consumers into using more of the Products per serving. Even if consumers eventually realize they need to adjust their

usage of the Products after tasting the sweetness, and scale back from a 1:1 ratio, reasonable consumers will not realize they need to use 1/250th the amount of the Products, especially when the Products are marketed as a "1:1 sugar replacement." When reasonable consumers see this claim, they are not going to think the Products are 250 times sweeter than sugar. On the contrary, when reasonable buyers see the Products' "1:1 sugar replacement," advertising scheme, they will think the Products are comparable to sugar, and can be used in the same amount and manner as regular table sugar.

39. Under the NLEA, the FDA deems a food product misbranded if it advertises nutrient content claims[2] that have not been defined by the FDA, or fall outside the FDA's established definitions. *See* 21 U.S.C. §§ 343(Q) and (R); and *See* 21 C.F.R. § 101.13. Similarly, Article 6 of California's Sherman Law, §§ 110665 and 110670 adopt the NLEA and the FDA's prohibition on false or misleading nutrient content claims.

40. Here, the Products' front labels exhibit at least two nutrient content claims: "zero calorie," and "zero net carbs." Both of these claims are false because they are based on an incorrect RACC. As demonstrated by independent studies referenced above, which showed that four grams of the Products and eight grams of the Products both had more than five calories and carbohydrates per amount, if Defendants had accurately relied on the correct and lawful serving size for the Products when they tallied their monk fruit sweeteners' carbohydrate levels, the resulting measurements would have belied the Products' front "zero net carb" and "zero calorie" labels.

41. Structure or function claims are claims that refer to a structure or function of the body ("structure/function claims"). Structure/function claims describe a food

---

[2] *See* FDCA §403(r)(2)(C), which defines nutrient content claims as "any direct statement about the level or range of a nutrient in the food," or " describes a food or an ingredient in a manner that suggests that a nutrient is absent or present in a certain amount."

ingredient's role in affecting or maintaining normal human structure or body functions. Under the FDCA, food is misbranded if its labelling contains false or misleading structure or function claims. California's Sherman Law, Article 6, §110670, imposes the same prohibition on false and misleading structure/function claims.

42. The Products' front labels clearly advertise "ZERO GLYCEMIC" twice in discrete, visible all cap letters. This claim, which reflects glycemic index, constitutes a structure/function claim because it refers to the structure and function of blood sugar levels. The "zero glycemic" claim tells a consumer that eating the Products will not raise blood sugar levels, thereby providing information about the Products' impact on a structure and function of the human body. However, in reality, the Products' structure/function claims are false and misleading because the sugar replacements' composition does not result in a zero glycemic index, nor have a relationship to any of the health benefits represented on the Products' front labels.

43. Defendants' "Zero Glycemic" health claim is unlawfully deceptive because it misleads consumers to conclude that the Products are healthy, especially for diabetics. Defendants advertise and emphasize a collection of front label claims on the Products that altogether lead a reasonable consumer to think that the Products are good for individuals and that the Products confer particular benefits for diabetics. When a person, especially one who has diabetes and who must monitor his sugar levels, sees the claims "zero glycemic," "zero calories," and "1:1 sugar replacement" in conglomeration, he will reasonably think that the food product is good for him and a sweetener that diabetics can safely use. In reality, the Products do not have a zero glycemic value, nor do the monkfruit-based sugar alternatives prevent blood sugar spikes. Notably, various studies have indicated that sugar substitutes like the Products can have the same effect as sugar on the human body, especially in terms of triggering increases in appetite. Likewise, multiple individuals have reported that their blood sugar levels immediately rose after consuming the Products, and that they

experienced one of the very side effects that diabetics seek to avoid. Additionally, reliable studies also have concluded that monkfruit-based sweeteners, such as the Products, do not have any unique or special benefits over sugar. Hence, the purported health benefits that Defendants advertise on the Products' front labels, including the "zero glycemic," advertising, are unsubstantiated, false and deceptive.

44.    The Products advertise statements that are collectively deceptive.  When a person reads the claims" zero glycemic," "zero calorie," "zero net carbs,", especially in conjunction with comments about "keto approved," and "1:1 sugar replacement" on a sugar replacement's front label, he will reasonably conclude that he can consume the substitute sweetener without side effects of weight gain, diabetes, or diabetes aggravation. In reality, the Products are not free from any of these dangers. The Products contain added sugars, carbohydrates, and  have  an abundance of calories as well. Moreover, the Products cause increases in blood sugar levels and  are not genuinely "zero glycemic," thereby carrying serious risks for diabetics. Consequently, in addition to deliberately tricking consumers, Defendants exposed the vulnerable group of diabetics to serious health risks. Furthermore, a person will very likely believe that the Products hinder weight gain since Defendants repeat the "zero glycemic," and "zero calorie" statements, thereby ensuring that consumers see them. Given that sugar substitutes can trigger similar hunger pangs as sugar, monkfruit sweeteners like the Products provoke the same risks and  dangers of weight gain  as sucrose.

45.    A food's glycemic index refers to how much the food boosts the ingestor's blood sugar. The glycemic index rates the effect of a specific amount of a food on blood sugar compared with the same amount of pure glucose. Doctors regularly advise diabetics to eat foods that have low glycemic index value, because food items with a low glycemic index value prevent blood sugar levels from spiking quickly. Additionally, people, including non-diabetics, also tend to seek out foods with low glycemic index values, as they believe such foods are healthier and help

stave off obesity or diabetes. Consumers also prefer foods with low glycemic index values because low glycemic index diets have shown the following benefits: reduce insulin resistance, reduce blood glucose spikes, reduce risk of diabetic complications by 20%, improve blood cholesterol and LDL cholesterol levels, increase the rate of weight loss, reduce waist circumference, prevent weight regain over the long term, and reduce the risk of vascular disease. Knowler WC, Barret-Connor E, Fowler SE, *et al. Reduction in the incidence of type 2 diabetes with lifestyle intervention or metformin*, N. Eng. J. Med., 346, 393-403 (2002). Foods with low glycemic index values have also been shown to improve sleep quality, improve energy levels and reduce the risk of heart disease, for both diabetics and non-diabetics. Fallabel, C., *How to Use the Glycemic Index for Diabetes Management,* DIABETES STRONG (Oct. 6, 2022).

46.     When consumers see a food product is labeled as "zero glycemic," they reasonably believe that the food has a glycemic index of zero.  Both individuals with and without diabetes place importance on the "zero glycemic" claim. Similarly, the Products' "zero glycemic" claim  will be especially important to consumers with diabetes. Defendants know the "zero glycemic" label is material to reasonable consumers. That is why Defendants place the claim so prominently in all bold caps on the Products' front panel, as well along the top of the Products' packaging.

47.     Defendants' marketing, labelling, and packaging of the Products are designed to, and do in fact, deceive, mislead and defraud consumers. Defendants have no reasonable basis for labelling, advertising, marketing and packaging the Products as being beneficial to health or an innocuous sugar substitute that is especially safe for diabetics. As a result, consumers are consistently misled into purchasing the Products for the commonly known  and/or advertised benefits and characteristics when in fact no such benefits could be conferred by the Products. The malicious actions taken by Defendants caused significant harm to consumers. Plaintiffs and similarly situated class members who purchased the Products because they reasonably

believed, based on Defendants' marketing, packaging, labelling and advertising schemes, that the Products were in fact zero net carbs, zero glycemic, zero calorie, a 1:1 sugar replacement, keto approved and keto. Thus, Plaintiffs were economically harmed by Defendants' misbranding, false labelling, deceptive marketing and misleading packaging of the Products. The value of the Products that Plaintiffs actually purchased and consumed was materially less than its value as misrepresented by Defendants.

48. Plaintiff Prescott purchased units the Products from supermarket and brick-and-mortar retail locations, including "Whole Foods" and "Grocery Outlet" in Santa Cruz County throughout the last three years and during the relevant time period. During the relevant time period of this litigation, Plaintiff Carter purchased units of the Products from retails locations in San Diego County, including "Costco," as well as "Sprouts" and "Grocery Outlet" supermarkets. Plaintiff Horowitz bought units of the Products during the relevant time period from grocery store locations in Los Angeles County, including "Aldo," "Walmart," and "Amazon Fresh."

49. Plaintiffs bought and consumed the Products because, based on Defendants' marketing and labelling scheme, they believed that the Products were in fact zero net carbs, zero glycemic, zero calorie, a 1:1 sugar replacement, keto approved and keto. Plaintiffs purchased the Products in reliance upon the nutritional and health benefits that Defendants advertised and marketed throughout the Products' labelling, and packaging, without knowledge of the fact that the Products perpetuated a misbranded RACC, and that they were not actually zero net carbs, zero glycemic, zero calorie, a 1:1 sugar replacement, keto approved nor keto. Plaintiffs consumed the Products as intended and would not have purchased units the Products if they had known that the advertising as described herein was false, misleading and deceptive.

50. During the time when they were purchasing and consuming the Products, Plaintiffs did not take steps to verify the Products' components or nutrient levels. Reasonable consumers such as Plaintiffs would not have considered it necessary to

verify the clear message conveyed by Defendants' labelling, advertising, marketing and packaging of the Products.

51. Plaintiffs would consider purchasing the Products again if the labelling were accurate.

## **RULE 9(B) ALLEGATIONS**

52. Federal Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To the extent necessary, as detailed in the paragraphs above and below, Plaintiffs have satisfied the requirement of Rule 9(b) by establishing the following elements with sufficient particularity:

53. WHO: Defendants made material misrepresentations and omissions of fact in the labelling, packaging and marketing of the Products.

54. WHAT: Defendants made material misrepresentations and omissions of fact by labelling, packaging and marketing the Products as zero glycemic," "zero calories," and "1:1 sugar replacement" and by misbranding the Products with a prohibited serving size. Defendants made these claims with respect to the Products even though the Products were not in fact zero calories, zero glycemic, zero net carbs, nor meet the requirements to make such claims. Defendants' misrepresentations and omissions were material because a reasonable consumer would not have purchased or paid as much for the Products if he or she knew that they contained false representations.

55. WHEN: Defendants made the material misrepresentations and omissions detailed herein continuously throughout the Class Period.

56. WHERE: Defendants' material misrepresentations and omissions were made, *inter alia*, on the labelling of the Products, on Defendants' website, and throughout Defendants' various other marketing and advertising scheme for the Products.

57. <u>HOW</u>: Defendants made written misrepresentations and failed to disclose material facts on the labelling and packaging of the Products and on their website and other advertising.

58. <u>WHY</u>: Defendants engaged in the material misrepresentations and omissions detailed herein for the express purpose of inducing Plaintiffs and other reasonable consumers to purchase and/or pay a premium for the Products based on the belief that they actually were a one-to-one sugar replacement, zero net carbs, zero calories and zero glycemic. Defendants profited by selling the Products to millions of unsuspecting consumers statewide in California, as well as nationwide.

## CLASS ACTION ALLEGATIONS

59. Plaintiffs bring this class action on behalf of themselves individually and all others similarly situated, pursuant to Fed. R. Civ. P. 23(a) and (b)(2) and/or (b)(3). Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this class action on behalf of themselves individually and all others similarly situated statewide in California. Plaintiffs seek to represent a class a comprised of all persons in California who, on or after September 21, 2016, in California, (the "Class Period") purchased the Products for household use and not for resale or distribution.

60. The proposed class consists of all consumers who purchased the Products in the State of California for personal use and not for resale, during the time period September 21, 2016, through the present. Excluded from the Class are Defendants, their affiliates, employees, officers and directors, any individual who received remuneration from Defendants in connection with that individual's use or endorsement of the Products, the Judge(s) assigned to this case, and the attorneys of record in this case. Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

61. This action is properly brought as a class action for the following reasons:

(a) The members in the proposed class are so numerous that individual joinder of all members is impracticable and disposition of the class members' claims in a single class action will provide substantial benefits to the parties and Court, and is in the best interests of the parties and judicial economy.

(b) Plaintiffs stand on equal footing with and can fairly and adequately protect the interests of all members of the proposed class. All units of the Products bear the misbranded RAACC and the "ZERO NET CARBS," "ZERO GLYCEMIC," "ZERO CALORIE," "1:1 SUGAR REPLACEMENT," "KETO APPROVED" and "KETO" labelling. Defendants' misbranded serving size, as well as their untrue statements and "ZERO NET CARBS," "ZERO GLYCEMIC," "ZERO CALORIE," "1:1 SUGAR REPLACEMENT," "KETO APPROVED" and "KETO" deceptive marketing occur on the packaging of the units of Products themselves. Thus, every individual consumer who purchases the Products is exposed to the false advertising. Defendants have, or have access to, address information for the Class Members, which may be used for the purpose of providing notice of the pendency of this class action. Further, the class definition itself describes a set of common characteristics sufficient to allow a prospective plaintiff or class member to identify himself or herself as having a right to recover based on the description.

(c) Plaintiffs will fairly and adequately represent and protect the interests of the class, have no interest incompatible with the interests of the class, and have retained counsel competent and experienced in class actions, consumer protection, and false advertising litigation, including within the context of food and the food industry. Plaintiffs' attorneys have the experience, knowledge, and resources to adequately and properly represent the interests of the proposed class. Plaintiffs will have no interests antagonistic to those of other proposed class members, and they have

retained attorneys experienced in consumer class actions and complex litigation as counsel.;

(d) Class treatment is superior to other options for resolution of the controversy because the relief sought for each class member is so small, that, absent representative litigation, it would be infeasible for class members to redress the wrongs done to them. Prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent or varying adjudications with respect to individual members of the class and thus establish incompatible standards of conduct for the party or parties opposing the class. Further, individual cases would be so numerous as to inefficiently exhaust judicial resources. Plaintiffs seek damages and equitable relief on behalf of the proposed class on grounds generally applicable to the entire proposed class.;

(e) Questions of law and fact common to the class predominate over any questions affecting only individual class members. There are questions of law and fact common to the proposed class which predominate over any questions that may affect particular class members. Such questions of law and fact common to Plaintiffs and the class include, without limitation:

    i. Whether Defendants were unjustly enriched by their conduct;

    ii. Whether Class Members suffered an ascertainable loss as a result of Defendants' misrepresentations;

    iii. Whether, as a result of Defendants' misconduct as alleged herein, Plaintiffs and the Class Members are entitled to restitution, injunctive relieve and/or monetary relief, and if so, the amount and natural of such relief;

    iv. Whether Defendants made any statement they knew or should have known were false or misleading;

v. Whether Defendants maintained a longstanding marketing policy, practice and strategy of labelling, advertising and selling the Products with the misbranded RACC and serving size, and "ZERO NET CARBS," "ZERO GLYCEMIC," "ZERO CALORIE," "1:1 SUGAR REPLACEMENT," "KETO APPROVED" and "KETO" claims, even though the Products failed to confer any of these purported nutritional contents or health benefits.

vi. Whether the utility of Defendants' practices, if any, outweighed the gravity of the harm to their victims;

vii. Whether Defendants' conduct violated public policy, included as declared by specific constitutional, statutory, or regulatory provisions;

viii. Whether Defendants' conduct or any of their practices violated the California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.,* the California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.,* The Federal Food, Drug and Cosmetics Act, 28 U.S.C. §§ 301 *et seq.* and its implementing regulations, 21 C.F.R. §§ 101 *et seq.,* the Cal. Health & Safety Code §§ 109875 et seq., or any other regulation, statute or law;

ix. Whether Defendants represented that the Products have characteristics, uses, or benefits which they do not have, within the meaning of Cal. Civ. Code § 1770(a)(5);

x. Whether Defendants represented that the Products are of a particular standard, quality, or grade, when they were really of another, within the meaning of Cal. Civ. Code § 1770(a)(7);

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT

xi. Whether Defendants advertised the Products with the intent not to sell them as advertised, within the meaning of Cal. Civ. Code § 1770(a)(9);

xii. Whether Defendants represented that the Products have been supplied in accordance with a previous representation when they have not, within the meaning of Cal. Civ. Code § 1770(a)(16);

xiii. The proper equitable and injunctive relief;

xiv. The proper amount of restitution or disgorgement;

xv. The proper amount of reasonable litigation expenses and attorneys' fees;

(f) Plaintiffs' claims are typical of the claims of the members of the proposed class. Plaintiffs and all class members have been injured by the same practices of Defendants. Plaintiffs' claims arise from the same practices and conduct that give rise to the claims of all class members and are based on the same legal theories. Plaintiffs' claims are typical of class members' claims, as they are based on the same underlying facts, events and circumstances relating to Defendants' conduct.;

(g) As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), (b)(1), (b)(2) and (b)(3), and may be appropriate for certification "with respect to particular issues" under Rule 23(b)(4).

## FIRST CAUSE OF ACTION

### Intentional Misrepresentation

62. Plaintiffs re-allege and incorporate herein by reference each and every allegation set forth above.

63. Plaintiffs bring this claim individually and on behalf of the members of their proposed Class.

64.    Defendants represented to Plaintiffs and other class members that important facts were true. More specifically, Defendants represented to Plaintiffs and the other class members through their advertising and labelling scheme for the Products, including that the Products were zero calories, and zero glycemic, and zero net carbs.

65.    Defendants' representations were false. Defendants knew that the misrepresentations were false when they made them, or Defendants made the representations recklessly and without regard for their truth. Defendants intended that Plaintiffs and other class members rely on the representations.

66.    Plaintiffs and the other class members reasonably relied on Defendants' representations.

67.    Plaintiffs and the other class members were financially harmed and suffered other damages, including but not limited to, emotional distress. Defendants' misrepresentations and/or nondisclosure were the immediate cause of Plaintiffs and the other class members purchasing the Products. Plaintiffs' and the other class members' reliance on Defendants' representations was the immediate cause of the financial loss and emotional distress (of the type that would naturally result from being led to believe that the food product you are purchasing and consuming is safe for diabetics when in fact it does not) sustained by Plaintiffs and the other class members.

68.    In absence of Defendants' misrepresentations and/or nondisclosure, as described above, Plaintiffs and the other class members, in all reasonable probability, would not have purchased the Products.

///

///

///

# SECOND CAUSE OF ACTION

## Negligent Misrepresentation

69.   Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

70.   Plaintiffs bring this claim individually and on behalf of the proposed Class against Defendants.

71.   As discussed above, Defendants represented the Products as in fact zero net carbs, zero glycemic, zero calorie, a 1:1 sugar replacement, keto approved and keto, but failed to disclose that the Products actually lacked these advertised nutritional compositions and health advantages. Likewise, Defendants fails to disclose that they  perpetuated an unlawful serving size and misbranded RACC. Defendants had a duty to disclose this information.

72.   At the time Defendants made these misrepresentations, Defendants knew or should have known that these misrepresentations were false or made them without knowledge of their truth or veracity.

73.   At an absolute minimum, Defendants negligently misrepresented or negligently omitted material facts about the Products. The negligent misrepresentations and omissions made by Defendants, upon which Plaintiffs and Class Members reasonably and justifiably relied, were intended to induce and actually induced Plaintiffs and Class Members to purchase the Products. Plaintiffs and Class Members would not have bought the Products if they had known the true facts.

74.   The negligent actions of Defendants caused damage to Plaintiffs and Class Members, who are entitled to damages and other legal and equitable relief as a result.

## THIRD CAUSE OF ACTION

### Violation of Cal. Civ. Code §§1750, *et seq*.

75.   Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT

76.    This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code §§ 1750, *et seq.* ("CLRA"). The CLRA prohibits any unfair, deceptive, and/or unlawful practices, as well as unconscionable commercial practices in connection with the sales of any goods or services to consumers. *See* Cal. Civ. Code §1770.

77.    The CLRA "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient economical procedures to secure such protection." Cal. Civ. Code § 1760.

78.    Defendants are each a "person" under the CLRA. Cal. Civ. Code §1761 (c).

79.    Plaintiffs and the putative Class Members are "consumers" under the CLRA.  Cal. Civ. Code §1761 (d).

80.    The Products constitute a "good" under the CLRA. Cal. Civ. Code §1761 (a).

81.    Plaintiffs' and the putative Class Members' purchases of the Products within the Class Period constitute "transactions'" under the CLRA. Cal. Civ. Code §1761 (e).

82.    Defendants' actions and conduct described herein reflect transactions that have resulted in the sale of goods to consumers.

83.    Defendants' failure to label the Products in accordance with California labelling requirements constitutes an unfair, deceptive, unlawful and unconscionable commercial practice.

84.    Defendants' actions have violated at least seven provisions of the CLRA, including §§ 1770(a)(1), 1770 (a)(2), 1770 (a)(3)1770(a)(5), 1770(a)(7), 1770 (a)(9) and 1770(a)(16).

85.    As a result of Defendants' violations, Plaintiffs and the Class suffered, and continue to suffer, ascertainable losses in the form of the purchase price they

paid for the unlawfully labelled and marketed Products, which they would not have paid had the Products been labelled correctly, or in the form of the reduced value of the Products relative to the Products as advertised and the retail price they paid.

86.    Pursuant to § 1782 of the CLRA, on or about May 16, 2020, Defendants were notified in writing of the particular violations of § 1770 of the CLRA, and asked to rectify the actions described above by providing monetary relief, agreeing to be bound by their legal obligations, and to give notice to all affected consumers of their intent to do so. Defendants were provided with a notice and demand letter, notifying them of their violations of the CLRA and demanding that within 30 days, Defendants remedy the unlawful, unfair, false, and/or deceptive practices complained of herein. Defendants were advised that if they refused the demand, Plaintiffs would seek monetary damages for themselves and all others similarly situated, as well as injunctive relief, restitution, and any other relief the Court may deem just and proper. Defendants have failed to comply with the letter, even after they were provided with the CLRA Notice again in June 2022 and November 2022. Consequently, pursuant to California Civil Code §1782, Plaintiffs, on behalf of themselves and all other members of the Class, seek compensatory damages and restitution of any ill-gotten gains due to Defendants' acts and practices that violate the CLRA.

87.    Defendants have failed to rectify or agree to rectify at least some of the violations  associated with actions detailed above and give notice to all affected consumers within 30 days of receipt of the Cal. Civ. Code § 1782 notice.  Thus, Plaintiffs seek actual damages and punitive damages for violations of the Act.

88.    In addition, pursuant to Cal. Civ. Code §1780(a)(2), Plaintiffs are entitled to, and therefore seeks, a Court order enjoining the above-described wrongful acts and practices that violate Cal. Civ. Code §1770.

89.    Plaintiffs and Class Members are also entitled to recover attorneys' fees, costs, expenses, disbursements, and punitive damages pursuant to Cal. Civ. Code §§ 1780 and 1781.

90.    Notably, shortly after being notified about its CLRA violations described herein,  and apprised of potential litigation, Defendant Saraya changed the Products' labelling and packaging scheme. These modifications included the fact that Products' nutritional panel was amended to reflect a serving size that equated to  the RACC established by the FDA, in place of Defendant Saraya's deceptive serving size amount.   Clearly, Defendant Saraya changed its misrepresentations because of Plaintiffs' instant litigation.   Plaintiffs' lawsuit motivated Defendant Saraya to voluntarily provide one of the forms injunctive relief sought in this litigation. Furthermore, as affirmed by the California Supreme Court, Plaintiffs here are already "successful" within the meaning of Cal. Code of Civ. Proc. Section 1021.5 because their lawsuit was a catalyst motivating Defendant Saraya to provide the "primary relief" sought, Plaintiffs' lawsuit had "merit" and achieved its catalytic effect by "threat of victory, not by dint of nuisance and threat of expense," and since Plaintiffs reasonably attempted to settle the litigation prior to filing the suit.  See *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal. 4th 553; see also *Tipton-Whittingham v. City of Los Angeles* (2004) 34 Cal. 4th 604. Likewise, Plaintiffs are already entitled to attorneys' fees here because "[Defendant Saraya] change[d] [its] behavior substantially because of, and in the sought by [Plaintiffs]." *Skinner v. Ken's Foods, Inc.* (2020) 53 Cal. App. 5th 938, 946 (citing *Folsom v. Butte County Assn. of Governments* (1982) 32. Cal. 3d 668, 685).

## FOURTH CAUSE OF ACTION

### Violation of California Business & Professions Code §§ 17500, *et seq.*

91.    Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

92.    Defendants engaged in unfair and deceptive acts and practices, in

violation of the California Business and Professions Code § 17500 *et seq.*, by marketing and/or selling the Products without disclosure of material fact about the Products. These acts and practices, as described above, have deceived Plaintiffs and other class members, causing them to lose money as herein alleged and have deceived and are likely to deceive the consuming public, in violation of those sections. Accordingly, Defendants' business acts and practices, as alleged herein, have caused injury to Plaintiffs and the other class members.

93. As detailed above, Defendants had a duty to disclose the Products' misbranded serving size value, as well as the fact that the Products' actually were not zero net carbs, zero glycemic, zero calorie, a 1:1 sugar replacement, keto approved nor keto, because this information reflected material facts of which Defendants had exclusive knowledge. Defendants actively concealed these material facts and Defendants made partial representations about the Products but suppressed some material facts. Defendants' misrepresentation and/or nondisclosure of the material fact was the immediate cause of Plaintiffs and the other class members purchasing the Products. In the absence of Defendants' misrepresentation and/or nondisclosure of facts, as described above, Plaintiffs and other class members would not have purchased the Products.

94. Plaintiffs and the other class members are entitled to relief, including full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits which may have been obtained by Defendants as a result of such business acts or practices, and enjoining Defendants to cease and desist from engaging in the practices described herein.

### **FIFTH CAUSE OF ACTION**

### **Violation of Business & Professions Code § 17200, *et seq*.**

95. Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

96. Plaintiffs seek to represent a Class consisting of "All persons who

purchased the Products in the State of California for personal use and not for resale during the time period September 21, 2016, through the present. Excluded from the Class are Defendants' officers, directors, and employees, and any individual who received remuneration from Defendants in connection with that individual's use or endorsement of the Products."

97.   The UCL prohibits "any unlawful, unfair... or fraudulent business act or practice." Cal. Bus & Prof. Code § 17200.

## A.   "Unfair" Prong

98.   Pursuant to California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*, a challenged activity is "unfair" when "any injury it causes outweighs any benefits provided to consumers and the injury is one that the consumers themselves could not reasonably avoid," *or* "the utility of the defendant's conduct is outweighed by the gravity of the harm to the alleged victim.

99.   Defendants' actions of engaging in false and deceptive advertising, marketing, labelling, and of the Products do not confer any benefit to consumers.

100. Defendants' actions of advertising, marketing, labelling, and the Products in a false, deceptive and misleading manner cause injuries to consumers because the consumers do not receive a sugar alternative commensurate with their reasonable expectation.

101. Defendants' actions of advertising, marketing, labelling, and the Products in a false, deceptive and misleading manner cause injuries to consumers because the consumers do not receive the benefits they reasonably expect from the Products.

102. Defendants' actions of advertising, marketing, and labelling the Products in a false, deceptive and misleading manner cause injuries to consumers because the consumers end up consuming a sugar alternative that is of a lower quality than what they reasonably were expecting and sought.

103. Defendants' actions of advertising, marketing, and labelling the Products in a false, deceptive and misleading manner cause injuries to consumers because the consumers end up overpaying for the Products and receiving a sugar alternative that is less than what they expected to receive.

104. Consumers cannot avoid any of the injuries caused by Defendants' false, misleading and deceptive labelling, advertising, and marketing of the Products.

105. Accordingly, the injuries caused by Defendants' activity of advertising, marketing, and labelling the Products in a false, deceptive and misleading manner outweigh any benefits.

106. Here, Defendants' conduct of advertising, labelling and marketing the Products in a false, deceptive, and misleading manner has no utility and financially harms purchasers. Thus, the utility of Defendants' conduct is vastly outweighed by the gravity of harm.

107. Defendants' labelling, marketing, and advertising of the Products, as alleged in the preceding paragraphs, is false, deceptive, misleading, and unreasonable, and constitutes unfair conduct.

108. Defendants knew or should have known of their unfair conduct.

109. As alleged in the preceding paragraphs, the misrepresentations by Defendants detailed above constitute an unfair business practice within the meaning of California Business and Professions Code § 17200.

110. There were reasonable available alternatives to further Defendants' legitimate business interests, other than the conduct described herein. Defendants could have marketed, labelled, advertised and packaged the Products truthfully, without any dishonest claims about the Products' nutrient levels and health benefits.

111. All of the conduct alleged herein occurs and continues to occur in Defendants' business. Defendants' wrongful conduct is part of a pattern or

generalized course of conduct repeated on thousands of occasions daily.

112. Pursuant to Business and Professions Code §§ 17203 and 17535, Plaintiffs and the Class seek an order of this Court enjoining Defendants from continuing to engage, use, or employ their practice of advertising, labelling and marketing the Products in an untruthful manner. Likewise, Plaintiffs and the Class seek an order requiring Defendants to disclose such misrepresentations, and additionally request an order awarding Plaintiffs restitution the money wrongfully acquired by Defendants by means of responsibility attached to Defendants' failure to disclose the existence and significance of said misrepresentations in an amount to be determined at trial. Plaintiffs and the Class Members also seek full restitution of all monies paid to Defendants as a result of their deceptive practices, interest at the highest rate allowable by law and the payment of Plaintiffs' attorneys' fees and costs pursuant to, *inter alia*, California Civil Code Procedure §1021.5.

113. As a direct and proximate result of these acts, consumers have been and continue to be harmed. Plaintiffs and the Class Members have suffered injury and actual out-of-pocket losses as a result of Defendants' violation of the unfair prong of the UCL because Plaintiffs and the Class would not have bought the Products if they had known the truth regarding the manipulated serving size and actual nutritional values of the Products. Plaintiffs and the Class paid an increased price due to the misrepresentations about the Products and the Products did not have the promised quality, effective, or value.

## B. "Fraudulent" Prong

114. California Business and Professions Code § 17200, *et seq.,* considers conduct fraudulent and therefore prohibits said conduct if it is likely to deceive members of the public.

115. Defendants' marketing, labelling, and advertising of the Products, as alleged in the preceding paragraphs, is false, deceptive, misleading, and

unreasonable, and constitutes fraudulent conduct. As alleged in the preceding paragraphs, the misrepresentations by Defendants detailed above constitute a fraudulent business practice in violation of California Business & Professions Code § 17200 because they are likely to, and did indeed, deceive members of the public.

116. Defendants knew or should have known of their fraudulent conduct.

117. There were reasonable available alternatives to further Defendants' legitimate business interests, other than the conduct described herein. Defendants could have labelled, advertised, marketed and packaged the Products accurately.

118. All of the conduct alleged herein occurs and continues to occur in Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

119. Pursuant to Business and Professions Code §§ 17203 and 17535, Plaintiffs and the Class seek an order of this Court requiring Defendants to cease the acts of fraudulent competition alleged herein. Likewise, Plaintiffs and the Class seek an order requiring Defendants to disclose such misrepresentations, and additionally request an order awarding Plaintiffs restitution of the money wrongfully acquired by Defendants by means of responsibility attached to Defendants' failure to disclose the existence and significance of said misrepresentations in an amount to be determined at trial. Plaintiffs and the Class Members also seek full restitution of all monies paid to Defendants as a result of their deceptive practices, interest at the highest rate allowable by law and the payment of Plaintiffs' attorneys' fees and costs pursuant to, *inter alia*, California Civil Code Procedure §1021.5.

120. As a direct and proximate result of these acts, consumers have been and continue to be harmed. Plaintiffs and the Class Members have suffered injury and actual out-of-pocket losses as a result of Defendants' violation of the fraudulent prong of the UCL because Plaintiffs and the Class would not have bought the Products if they had known the truth regarding the nutritional content

and physiological side effects the Products. Plaintiffs and the Class paid an increased price due to the misrepresentations about the Products and the Products did not have the promised quality, effectiveness, or value.

### C. "Unlawful" Prong

121. California Business and Professions Code § 17200, *et seq.,* identifies violations of other laws as "unlawful practices that the unfair competition law makes independently actionable."

122. Defendants' labelling and marketing of the Products, as alleged in the preceding paragraphs, violates California Civil Code § 1750, *et. seq.,* California Business and Professions Code § 17500, *et. seq.,* California's Sherman Law, and the FDCA.

123. Defendants' labelling and marketing of the Products, as alleged in the preceding paragraphs, is false, deceptive, misleading, and unreasonable, and constitutes unlawful conduct. Defendants have violated the "unlawful prong" by violating, the FDCA, California's Sherman Law, as well as the State's FAL (Cal. Bus. & Prof. Code § 17500 *et seq.)* and CLRA (Cal. Civ. Code §1770 *et. seq.*).

124. Defendants knew or should have known of their unlawful conduct.

125. As alleged in the preceding paragraphs, the misrepresentations by Defendants detailed above constitute an unlawful business practice within the meaning of California Business and Professions Code § 17200.

126. There were reasonable available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

127. All of the conduct alleged herein occurred and continues to occur in Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

128. As a direct and proximate result of these acts, consumers have been and continue to be harmed. Plaintiffs and the Class Members have suffered injury and actual out-of-pocket losses as a result of Defendants' violation of the unlawful

prong of the UCL because Plaintiffs and the Class would not have bought the Products if they had known the truth regarding nutritional components and potential harms of the Products. Plaintiffs and the Class paid an increased price due to the misrepresentations about the Products and the Products did not have the promised quality, effectiveness, or value.

129. Pursuant to Bus. & Prof. Code §§ 17203 and 17535, Plaintiffs and the Class are therefore entitled to an order requiring Defendants to cease the acts of unfair competition alleged herein, full restitution of all monies paid to Defendants as a result of their deceptive practices, interest at the highest rate allowable by law and the payment of Plaintiffs' attorneys' fees and costs pursuant to, *inter alia*, California Civil Code Procedure §1021.5.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of the Class defined herein, pray for judgment and relief on all Causes of Action as follows:

A.     This action be certified and maintained as a class action and certify the proposed class as defined, appointing Plaintiffs as representatives of the Class, and appointing the attorneys and law firms representing Plaintiffs as counsel for the Class;

B.     For an order declaring the Defendants' conduct violates the statutes referenced herein;

C.     That the Court awards compensatory, statutory and/or punitive damages as to all Causes of Action where such relief is permitted;

D.     That the Court awards Plaintiffs and proposed class members the costs of this action, including reasonable attorneys' fees and expenses;

E.     For an order enjoining Defendants from continuing to engage in the unlawful conduct and practices described herein;

F.     That the Court awards equitable monetary relief, including restitution and disgorgement of all ill-gotten gains, and the imposition of a

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT

constructive trust upon, or otherwise restricting the proceeds of Defendants' ill-gotten gains, to ensure that Plaintiffs and proposed class members have an effective remedy;

G. That the Court awards pre-judgment and post-judgment interest at the legal rate;

H. That the Court orders appropriate declaratory relief; and

I. That the Court grants such other and further as may be just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated:     September 28, 2023          **DOGRA LAW GROUP PC**

By: _____
SHALINI DOGRA, ESQ.
Attorney for Plaintiffs

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT